IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CANADIAN PACIFIC RAILWAY COMPANY, )<br>a Canadian Corporation, )<br> )<br>      Plaintiff, Counter-Defendant, )<br> )<br>NATIONAL STEEL CAR, LIMITED, )<br>a Canadian Corporation, )<br> )<br>      Involuntary Plaintiff, )<br>      Counter-Defendant, )<br>    v. )<br> )<br>WILLIAMS-HAYWARD PROTECTIVE )<br>COATINGS, INC., an Illinois Corporation, )<br> )<br>      Defendant, Counter-Plaintiff. ) | Case No. 02 C 8800 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In its Second Amended Complaint, Plaintiff, Counter-Defendant Canadian Pacific

Railway Company ("CPR") alleges breach of express and implied warranties, unjust enrichment,

and promissory estoppel arising out of the use of Defendant, Counter-Plaintiff Williams-

Hayward Protective Coatings, Inc.'s ("Williams-Hayward") High-Rubber Thermalbond paint on

its boxcars. In its Second Amended Counterclaim, Involuntary Plaintiff, Counter-Defendant

National Steel Car, Ltd. ("NSC") alleges breach of express and implied warranties, unjust

enrichment, promissory estoppel, tortious interference with contract, and fraudulent

misrepresentation and concealment against Williams-Hayward. Williams-Hayward filed

Counterclaims against both NSC and CPR, including a breach of contract claim in Count 1

against NSC. Before the Court is Williams-Hayward's Motions for Summary Judgment as to all

of CPR's claims in its Second Amended Complaint and all of NSC's claims in its Second Amended Counterclaim. Williams-Hayward also moves for summary judgment against NSC on Count I of Williams-Hayward's Counterclaim. For the following reasons, the Court grants in part and denies in part Williams-Hayward's motions.

## BACKGROUND

### I. Northern District of Illinois Local Rules

Northern District of Illinois Local Rule 56.1 governs the admission of facts in this background section. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. If a responding party does not admit or deny each fact presented by the movant, the movant's statement may be deemed as admitted. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). If the responding party denies the movant's facts, he must also provide citations to evidentiary material supporting the denial. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). With these standards in mind, the Court turns to the relevant facts in this case.

### II. Relevant Facts

#### A. Parties and Individuals Involved

CPR is a Canadian corporation that operates a Class I railroad through the United States and Canada, and is headquartered in Calgary, Alberta. (R. 282-1, Plaintiffs' Joint Statement of Facts, ¶ 1; R. 250-1, Defendant's Statement of Facts, ¶ 3.) NSC is a rail car manufacturer located in Hamilton, Ontario. (Pls' Stmt. ¶ 2; Def.'s Stmt. ¶ 2.) Williams-Hayward is an Illinois

corporation that manufactures paint. (Pls' Stmt. ¶ 4; Def.'s Stmt. ¶ 1.)

Wayne Kurcz is Williams-Hayward's Executive Vice President and is responsible for Williams-Hayward's internal operations. (*Id.* ¶ 5.) Kurcz has a Masters Degree in chemistry and has worked at Williams-Hayward since 1973. (*Id.*) William-Hayward's technical service staff includes Norman Black, who also serves as Williams-Hayward's Director of Canadian Operations. (*Id.* ¶ 6.) Prior to working at Williams-Hayward, Black worked for a company in the business of constructing, repairing, and leasing rail cars and for another company that is a coating supplier and competitor of Williams-Hayward. (*Id.* ¶ 7.)

Martin Quintal has served as CPR's sourcing manager since 2002. (Def.'s Stmt. ¶ 17.) Between 1999 and 2002, Quintal was CPR's senior sourcing specialist and from 1997 until 1999, Quintal was the purchasing manager for freight cars. (*Id.*) As purchasing manager, Quintal handled new freight car purchases, replenished freight car parts, and supervised six subordinates. (*Id.* ¶ 19.) As senior sourcing specialist, Quintal continued to handle the purchasing of freight cars and car parts. (*Id.* ¶ 20.) Quintal's duties as sourcing manager are similar to his responsibilities as a senior sourcing specialist, except that he also supervises a sourcing specialist and two buyers. (*Id.* ¶ 21.)

CPR has employed Charles Cheun since 1997 as a car equipment engineer. (*Id.* ¶ 26.) From 1981 until 1997, Cheun held the positions of quality system engineer, senior quality assurance, manager of quality assurance, supervisor of quality assurance, and assistant supervisor of quality assurance. (*Id.*) Cheun has a Bachelors Degree in mechanical engineering and a certificate of general management from the University of Calgary. (*Id.*)

## B.     Bi-Level Boxcar Build

In 1999, Williams-Hayward and CPR had an initial meeting concerning a bi-level boxcar build at which Cheun, Quintal, and Kurcz discussed Kurcz's desire for CPR to specify Williams-Hayward's High-Rubber Thermalbond paint on a car build for bi–level auto racks that CPR was planning to manufacture. (Pls' Stmt. ¶ 14; Def.'s Stmt. ¶ 44.)  At the end of the meeting, there was an understanding that Kurcz would contact Quintal about their discussions. (Pls' Stmt. ¶ 14.)  On August 30, 1999, Kurcz sent a letter to Quintal stating:

> Based upon my discussions with you and Mr. Charles N. P. Cheun, we are pleased to make the following proposals. Williams-Hayward Protective Coatings, Inc.'s ultimate goal is to develop a long-term contract to freeze pricing for three to four years, however, we understand the problem you may face projecting future new car and repair business. We, therefore, will offer a one year contract renewable at the Canadian Pacific Railway's option. If we are able to stabilize pricing through the time period then rebate values will remain the same. If not, then your office will be notified 90 days prior to your renewal date.

(Def.'s Stmt. ¶ 46; Def.'s Ex 4; Pls' Stmt. ¶ 15.)

Kurcz attached a proposed purchase agreement, including a rebate agreement signed by Kurcz on behalf of Williams-Hayward, to his August 30, 1999, letter. (Def.'s Stmt. ¶ 46; Def.'s Ex. 4.)  The proposed rebate agreement contained a warranty provision that provided in pertinent part:

PRO-RATED WARRANTY

All goods sold by WHPC are warranted to be free from defects in material and workmanship pro-rated over the five (5) years on exterior, eight (8) years on the interior from the date of application of paint on the railroad unit provided from the date the paint was shipped from WHPC. The foregoing warranty is in lieu and excludes all other warranties not expressly set forth herein, whether express or implied by operation of law or otherwise, including but not limited to any implied warranties of merchantability or fitness....

THIS WARRANTY IS IN LIEU OF ALL WARRANTIES, OR
MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER
WARRANTIES, EXPRESS OR IMPLIED, EXCEPT OF TITLE AND
AGAINST PATENT INFRINGEMENT.

(Def.'s Stmt. ¶ 48; Def.'s Ex. 4.)  In a letter dated September 3, 1999, from Kurcz to Quintal,

Kurcz provided prices for various Williams-Hayward paints for the rail cars that CPR was

contemplating building.  (Def.'s Stmt. ¶ 53.)  The letter contained no references to any

warranties.  (*Id.*)

The parties do not dispute that Quintal never signed the proposed purchase agreement.

(Pls' Stmt. ¶ 17; Def.'s Ex. 4.)  At his deposition, Quintal testified that he could not accept

Kurcz's proposal on its terms because CPR could not give Williams-Hayward all of its paint

business.  (Pls' Stmt. ¶ 17; Pls' Ex. 6.)  Instead, Quintal sent a letter to Kurcz on October 1,

1999, which stated:

> Please refer to your proposals dated August 30th and September 3rd, 1999, which
> includes [sic] rebates and prices for paint products related to our new freight car
> program.  This letter will confirm CPR's desire to do business with Williams-
> Hayward Protective Coatings, Inc. (WHPC).
>
> As discussed, we will not be able to guarantee 90% of our business to WHPC.  I
> will however offer you our business in year 2000 relative to new bi-level racks,
> using rebates offered by WHPC for these cars.
>
> The first confirmed project consists in 243 bi-level racks to be built by Thrall
> Manufacturing starting in January, 2000 (Job no. 99-0534).  We have specified
> WHPC's Thermalbond paint in our car specifications to Thrall.
>
> My understanding of your offer is that:
>
> (1) a US $1.00/U.S. Gal. rebate will be remitted to CPR at the end of the program.
>
> (2) WHPC will track volume of paint ordered by Thrall for this order and
> gallonage shipped will be faxed to me for my records.  A monthly report of the
> rebate status will also be faxed to this office.

(3) WHPC will perform unannounced audits at Thrall, at the minimum once, with copies of the audits sent to this office.

(4) pro-rated warranty on this product is 5 years.

Please confirm that my understanding is correct.

As I might have hinted to you, CPR has other projects for 2000 such as coal cars, boxcars and more bi-levels. If this initial project proves to be successful, I am prepared to maximize the business given to WHPC for those projects. I will keep you posted.

(Def.'s Stmt. ¶ 54; Pls' Ex. 25.)

In a letter dated October 4, 1999, Kurcz responded to Quintal's October 1, 1999, letter:

Thank you for you response of October 1st, and you are correct as to our agreement. As we had discussed, Williams-Hayward Protective Coatings, Inc. is very interested in demonstrating the value of our waterborne products on your hopper fleet, also, and would appreciate any assistance the Canadian Pacific Railway can give us to do so at your Canadian manufacturers. Naturally, the rebates will apply as stated in my earlier communique.

(Def.'s Stmt. ¶ 57; Def.'s Ex. 7.)

At his deposition, Quintal testified that he had telephone conversations and meetings with Kurcz concerning their projects after the bi-level boxcar build. (Pls' Ex. 6, Quintal Dep. at 100-01.) Kurcz and Quintal also discussed the rebates for the different car builds. (*Id.* at 101.) Although Williams-Hayward gave CPR rebates on several different projects, the parties dispute whether an agreement on a rebate applied to the boxcar project at issue in this litigation. (Pls' Stmt. ¶ 24; Def.'s Stmt. ¶¶ 74-78.) At his deposition, Kurcz testified that he believed that Quintal's October 1, 1999, letter "activated" the warranty provisions in the initial 1999 rebate agreement and that the warranty provisions and disclaimers applied to all of the parties' subsequent projects. (Pls' Stmt. ¶ 24; Pl.'s Ex. 1; Kurcz Dep. at 263-66.)

## C.    Paper Boxcar Build

In 2000, CPR formed a project team to acquire a large number of boxcars. (Pls' Stmt. ¶ 35; Def.'s Stmt. ¶ 86.) CPR management requested Cheun to draft the specifications for the contemplated construction of three types of boxcars – paper boxcars, pulp boxcars, and oriented strand board (OSB) boxcars. (Pls' Stmt. ¶ 36; Def.'s Stmt. ¶ 106.) The boxcar team concluded that CPR needed a new boxcar designed for the purpose of carrying paper rolls to expand capacity, reduce damage to the paper rolls, and make it easier to load and unload the lading. (Def.'s Stmt. ¶ 99.) The paper boxcars were to carry rolled paper used to print newspapers. (Pls' Stmt. ¶ 37.)

On July 18, 2000, CPR issued a Request for Quotation ("RFQ") for the construction of 1,000 boxcars to several car builders in North America, including NSC. (Pls' Stmt. ¶ 41.) The RFQ stated that CPR's objective was "to provide CPR shippers with a high quality, state-of-the-art boxcar that not only ensures damage free transportation, but also accommodates 286,000 lbs loading." (Def.'s Stmt. ¶ 127.) CPR received bids from several manufacturers and in December 2000, CPR verbally awarded NSC the contract to manufacture the boxcar order. (Pls' Stmt. ¶ 42; Def.'s Stmt. ¶ 146.) On June 21, 2001, NSC and CPR entered into a written purchase agreement for NSC's construction of the OSB and paper boxcars. (Pls' Stmt. ¶ 45, Def.'s Stmt. ¶ 147.)

Prior to awarding NSC the contract, Hugh Nicholson of NSC emailed Quintal and Cheun about CPR's approved listing of suppliers for waterborne paints. (Def.'s Stmt. ¶¶ 148-150; Def.'s Ex. 263.) Cheun responded to Nicholson indicating that they had three approved suppliers – Sigma, Williams-Hayward, and Davis Frost. (Def's Stmt. ¶ 150; Pls' Stmt. ¶ 52.) On July 20, 2000, Nicholson emailed Cheun stating that it was NSC's intention to quote Williams-Hayward

Thermalbond Acrylic TER Polymer paint. (Def.'s Stmt. ¶ 151; Def.'s Ex. 398.) On July 21, 2000, Cheun emailed Norman Black, Williams-Hayward's Director of Canadian Operations, asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our new paper boxcars or if there is a better coating that you would recommend?" (Pls' Stmt. ¶ 54; Def.'s Stmt. ¶ 152.) On July 25, 2000, Black responded by suggesting certain interior and exterior Thermalbond products. (Pls' Stmt. ¶ 55; Def.'s Stmt. ¶ 153.) At his deposition, Black testified that he knew that CPR planned to build boxcars and that some of the boxcars would be used for paper service. (Pls' Stmt. ¶ 57, Pls' Ex. 4, Black Dep. at 661.)

In July 2000, Black met with Dennis Ryan, NSC's Managing Director. (Pls' Stmt. ¶ 56.) Ryan testified that Black provided him with information concerning Williams-Hayward's recommendations for the exterior and interior paint for the boxcars and indicated that Williams-Hayward was CPR's supplier of choice. (Pls' Stmt. ¶ 58; Pls' Ex.10, Ryan Dep. at 63-64.) The information Black provided included the recommended part numbers, also known as "specs," and pricing. (*Id.* at 64.) Ryan also testified that in later meetings with Black, they discussed the specifics of the paper boxcar projects, such as the type of loading, the importance of the interior lining, and that the boxcars would be hauling newspaper service. (*Id.* at 69.)

At his deposition, Quintal testified that he discussed the OSB and paper car builds with Kurcz prior to CPR awarding the boxcar project to NSC. (Pls' Stmt. ¶ 46; Pls' Ex. 6, Quintal Dep. at 158-59.) Cheun testified that both Kurcz and Black had told him that other railways had used Williams-Hayward paint in boxcar and paper service. (Pls' Stmt. ¶ 48; Pls' Ex. 5, Cheun Dep. at 283-84.) Before NSC commenced construction of the boxcar order, Kurcz gave NSC a Power Point presentation on Williams-Hayward's waterborne coating systems. (Pls' Stmt. ¶ 64.)

8

On at least five occasions, NSC performed trial applications of Williams-Hayward's paint at which Black attended. (*Id.* ¶ 77.) Some, but not all of these trial applications involved the use of High-Rubber Thermalbond. (*Id.*) None of these trial applications were performed on boxcars. (*Id.*) At his deposition, Black testified that the main purpose of the trial applications was to go over the "do's and don't's" for using waterborne as opposed to solvent-based paints, educate the painters, and remind them to use the correct techniques. (*Id.* ¶ 78.) Black also attended the trial applications to answer questions and oversee the application of the paint. (*Id.*)

### D. NSC's Purchase Order

In May 2001, NSC issued a purchase order for the paint to be applied to the paper boxcars. (Def.'s Stmt. ¶ 6; Pls' Stmt. ¶ 85.) Conditions in the purchase order contained the following language: "Unless otherwise specified, the Seller expressly warrants that all the material and work covered by this order will conform to the specifications, drawings, samples or other description, if any, furnished or specified by Buyer, and will be merchantable, of good material and workmanship and free from defect." (Pls' Stmt. ¶ 96, Pls' Ex. 56.) The purchase order also stated: "Suppliers are responsible for understanding the nature of the work and the tolerances the parts must meet." (*Id.* ¶ 98, Pls' Ex. 56, at 9.) Also, the purchase order specifically prohibited "any attempt by the Seller to impose any additional terms through invoices." (*Id.* ¶ 94, Pls' Ex. 56, ¶ 1(B)).

NSC mailed Williams-Hayward a signed copy of the purchase order and an "Acknowledgment Copy" for Williams-Hayward to sign. (Pls' Stmt. ¶ 101.) Williams-Hayward signed the "Acknowledgment Copy" of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT

9

TO ALL TERMS AND CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF.
(Pls' Ex. 56, at 1.)

### E.    Pull-Ahead Car and Subsequent Correspondence

On August 1, 2001, NSC delivered to CPR the first paper boxcar, also know as the pull-ahead car. (Pls' Stmt. ¶ 108; Def.'s Stmt. ¶ 173.) The newsprint paper supplier loaded the pull-ahead car and shipped it to the Minneapolis Star Tribune. (Pls' Stmt. ¶ 110, Def.'s Stmt. ¶ 173). Upon unloading, it was discovered that the protective wrappers that covered the paper rolls were sticking to the wall of the paper boxcar, tearing off the rolls, and thus exposing the paper rolls. (Pls' Stmt. ¶ 111, Def.'s Stmt. ¶¶ 173-74.) After the pull-ahead car run, the supplier of the paper rolls required a second test run before it would accept the fleet of rail cars into its business service. (Pls' Stmt. ¶ 115.)

Following his inspection of the pull-ahead car, Williams-Hayward's Black informed Alistair Wilson, Executive Vice President of NSC, that if NSC controlled its millage parameter – the minimum and maximum thickness requirements – the sticking problem would be eliminated. (*Id.* ¶¶ 116-17.) During this time period, NSC requested Black's approval to switch from the High-Rubber Thermalbond to another paint for application to the paper boxcar's interiors. (*Id.* ¶ 119.) Black informed NSC that Williams-Hayward would not warrant the alternate coating. (*Id.* ¶ 120.) Consequently, NSC asked Black for a letter of assurance that, if the High-Rubber Thermalbond paint was properly applied and dried, the paint would not present the type of sticking problems NSC experienced with the pull-ahead car. (*Id.*)

On September 5, 2001, Black emailed Kurcz about the situation:

As you are aware CP reported to NSC that they had a problem with one of the cars

10

from the first 375 car order. The car was loaded with finished paper and after unloading the first load from the subject car the customer reported that some of the paper wrapping had stuck to the floor and walls. I think that the floor is an issue with chalking. NSC's records indicate that the walls of the subject car had received considerable repairs after the initial coating application. I get the impression that NSC are [sic] thinking that the problem may be an isolated case and they may have contributed to the problem. As you may also be aware, NSC approached me yesterday to see if we would supply General Service interior white for the next group of CP boxcars (625 cars). They originally specified our high rubber white (72-6427-CP). I spoke to Mark about this and have since informed NSC that this is not a good idea and WHPC would not warranty this coating in dedicated paper service. I advised them about the recent Valspar/Gunderson cars (that they were aware of). The next group of CP cars are in position to paint/coat tonight or tomorrow. I have adequate stock of 72-6427 at NSC.

TO GET TO THE POINT – NSC requested a letter from WHPC that would assure them that if this product is applied correctly and force cured it will not present the type of problem they experienced with this one car. They would like some type of assurance that we have used this product in paper service for X number of years etc. I offered to provide them this letter but they requested that it come from higher up and longer tenure than I. The reason I have to send this request to you.

Can you please provide such a letter/email to Mr. Todd Pafford at NSC, Todd's email address is, _____, as soon as possible.

Give me a call if you have any questions or wish to discuss.

(*Id.* ¶ 122, Pls' Ex. 57.) On September 5, 2001, Kurcz wrote Todd Pafford via email in response to Black's request. (*Id.* ¶ 123; Def.'s Stmt. ¶ 178.) Kurcz stated:

I am writing you this communique in response to you [sic] request of our Director of Canadian Operations as to our recommendations for the interior of Boxcars that are exposed to the chemical environment of Paper service. Thermalbond High Rubber coatings were developed in 1984 as replacements for vinyl's and epoxies in severely corrosive services. Since that time these products have been successfully used in both acid and alkali services for tank car hopper cars and interiors of boxcars and potash service. High rubber Thermalbond has become the standard in the Cloro-Alkali business and the Sulfuric Acid business. The chemical resistance has stood the test of time and this is the main reason we recommend this system for such severe services. We believe the situation that has been noted on one unit done by NSC for the CP is isolated and most likely associated with the high mills in the repair areas that might not have been fully

dry; this should not at all reflect on the viability of the product for the end use intended. We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC and to our mutual customer Canadian Pacific Railroad. We will not Warranty a general service version of Thermalbond in corrosive service for our Warranties are based on real fleet data and not theoretical data. The histories of current industry failures, not related to our products only add credence to our claims. If applied and dried properly these systems have and will for National Steel Car pose no problems in the service they are being used for. We are confident that NSC has for the over whelming [sic] majority of the units fulfilled their requirements on the application side. Once we see the unit in question we may better determine what the causes are, in my 30 years of developing water based products for the rail and chemical industry there have been times where neither the applicator nor the coating are the cause. When push comes to shove we rely on our rich in service fleet data and NSC can be confident that using these products will in the long run reduce concerns rather than create them.

Thank your [sic] for using our unique High Rubber Thermalbond and General Service Thermalbond products and if I may be of any further service plead do not hesitate to contact me.

(Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

On September 19-20, 2001, Wilson and Kurcz exchanges a series of emails regarding the sticking problem in the pull-ahead car. (Pls' Stmt. ¶¶ 128-29.) Initially, Wilson emailed Kurcz about the "jack test" NSC used to simulate roll pressure against the wall of a paper boxcar and that the "jack test" had failed because paper fibers were stuck to the wall of the boxcar. (*Id.* ¶ 128.) Wilson stated to Kurcz: "Because of our limited experience with this material we need concurrence that this is the way the material is supposed to react." (*Id.* ¶ 129, Pls' Ex. 33. ) Wilson further stated: "Based upon our observation of this test we have elected to discontinue applying the interior coating until advised otherwise which will have an impact on our production effectiveness. It is most important that we receive your confirmation or further

12

instructions as quickly as absolutely possible." (*Id.*) Wilson also explained to Kurcz: "Again because of our limited experience with this material we need full "buy-off" from Williams Hayward that our application is being applied in accordance with your technical requirements and is fit for the service intended." (*Id.* ¶ 130, Pls' Ex. 33.)

During Kurcz and Wilson's email exchange, Kurcz responded to Wilson's concerns stating the following:

> There is absolutely nothing wrong with our product and your test cars will prove it.
>
> Williams Hayward Protective Coatings will take no exceptions and warranty our product as to your process.
>
> Williams Hayward Protective Coatings feels no need for you to perform any tests. We are satisfied NSC may proceed with your currant [sic] applications as long as you are following the recommended cure parameters we have given you. Norm [Black] will work very close with your people to ensure these procedures are followed and any concerns you may have are addressed.
>
> If you listen to us then you will be successful and if we mislead you it is our responsibility and liability.

(*Id.* ¶ 133, Pls' Ex. 33.)

### F. The Second Trial Car

On October 12, 2001, NSC released another trial boxcar – paper car 220164. (Pls' Stmt. ¶ 145.) In November 2001, the newsprint paper supplier loaded paper car 220164 and then shipped the paper rolls to the Minneapolis Star Tribune, where the paper rolls were unloaded. (*Id.* ¶ 146.) Again, there was a problem with paint sticking to the paper rolls and the interior walls of the boxcar, and thus the Star Tribune would not sign-off on the paper cars' usage at that time. (*Id.* ¶¶ 146-47, Pls' Ex. 62.) Cheun of CPR then emailed Kurcz requesting that Kurcz

send someone to investigate paper car 220164 in Minneapolis. (*Id.* ¶ 148, Pls' Ex. 66.) On November 4, 2001, Kurcz forwarded Cheun's email to Black and Ed Kurcz of Williams-Hayward and stating: "Check this out get photos and mill thickness readings. Immediately. Ed I need you to go personally also this could be big trouble if it is not a mill thickness issue up stay in contact with Norm. I have my mobile with me." (*Id.*)

## G. Changes to the Paint Application Process

Meanwhile, in late September 2001, Black recommended that NSC change its paint application process and NSC subsequently implemented the recommended process. (*Id.* ¶¶ 139-142.) On November 14, 2001, Williams Hayward gave NSC a 10-page document entitled "Facility Coatings Application & Cure Recommendations for Canadian Pacific Railroad Box Cars for Hot Paper Service at National Steel Car, Hamilton, Ontario" that Kurcz had signed. (*Id.* ¶ 152.) This document contained detailed recommendations concerning the procedures for applying the paint and NSC complied with these new procedures. (*Id.* ¶ 157.) The November 14, 2001, recommendation stated: "It is of critical importance that Williams Hayward Protective Coatings representatives are permitted to audit the Process established to certify and write off on the cars for shipment. Our method of write off on each car will be to certify in writing the process at the beginning of each shift taking all necessary measurements and verifying against the standards established." (*Id.* ¶ 154.)

From November 14, 2001, to December 19, 2001, Black of Williams-Hayward monitored the dry film thickness readings. (*Id.* ¶ 158.) Williams-Hayward also reformulated the High-Rubber Thermalbond by replacing a solvent to make it dry faster, and sent the reformulated paint to NSC in mid-November 2001. (*Id.* ¶¶ 162-63.)

## H.  Events of November 2001

Around November 16, 2001, paper boxcars were loaded with newsprint paper rolls and then shipped to Lancaster, Pennsylvania. (*Id.* ¶ 164.) After unloading the paper cars, it was discovered that the paper rolls stuck to the interior paint. (*Id.*)

On or about November 21, 2001, CPR informed NSC that it would not accept any paper boxcars with Williams-Hayward interiors unless they were lined with cardboard. (*Id.* ¶ 165.) On November 21, 2001, NSC wrote Williams-Hayward and informed it that because NSC was in full compliance with Williams-Hayward's requirements, the cost of lining the paper boxcars with cardboard would be held strictly to Williams-Hayward's account. (*Id.* ¶ 166.) Williams-Hayward replied that it would not accept any charges and therefore had no choice but to request NSC to terminate use of the High-Rubber Thermalbond until they clarified the issue. (*Id.* ¶ 167.)

## I.  Events of December 2001

On December 18, 2001, Kurcz sent an email to Pafford at NSC that stated in relevant part:

> I received your voice mail and have put together some information that may help you understand why one would choose or we would recommend Thermalbond as the coating system for the insides of the boxcars. I guess after all these years, I have taken for granted, that everyone in the rail industry knows of Williams Hayward Protective Coatings [sic] position with water-based paints. While for many years in the US we have been the major source of supply of these products at all major railroads and car builders; that has most certainly not been the case with National Steel Car. Not to take up too much of your time I put together a little history of our High rubber Thermalbond as it relates to box car interiors. As to our relationship with the Canadian Pacific Railroad it goes back many years, for we have been the major supplier for Thrall Car Manufacturing since the mid 1970s. For any freight cars, (auto-racks, coal cars, gondolas, hoppers etc.), built for the Canadian Pacific Railroad or for that matter any other Rail Road by Thrall since 1994, Thermalbond would be the coating system applied.

15

> So the total number of boxcars we can prove had our Thermalbond Interior product in, over the years is 12,000. Whether you wish to believe it or not there has not been "ONE" paper sticking complaint over the years and we are still supplying to this day, the Union Pacific Rail Road, the Canadian National/IC Rail Road and the Canadian Pacific shops.
>
> ....
>
> Any and all things I have stated can be substantiated, for Williams Hayward Protective Coatings is the oldest supplier of water based products in the rail industry and we are confident we are also the best. The system given to The [sic] CP and applied by you is a time tested excellent product with a long pedigree. The product will do the job it was intended to do and give the customer the extra chemical resistance they need in pulp services.

(Def's Stmt. ¶ 200, Pls' Stmt. ¶ 172, Pls' Ex. 64.)

According to NSC's Wilson, in December 2001, CPR informed NSC that it would no longer accept or pay for any paper cars whose interiors were coated with High-Rubber Thermalbond. (Pls' Stmt. ¶ 173.) On December 20, 2001, NSC stopped processing the paper cars. (*Id.* ¶ 174.) On December 21, 2001, NSC, CPR, and Williams-Hayward participated in a conference call. (*Id.* ¶ 175.) The parties dispute that during the conference call, Kurcz stated that some of the boxcars from the other railroad companies that had used High-Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that it was an accepted industry problem. (*Id.*; Wright's Dep. at 249-255, Kurcz's Dep. at 729-735.) Further, the parties dispute that Kurcz stated that had he known that paper sticking was not acceptable to CPR, he never would have recommended the High Rubber Thermalbond paint for the interior of the boxcars. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Anderson,* 477 U.S. at 255.

## ANALYSIS

### I.    Summary Judgment Motion Against CPR

In support of its motion for summary judgment against CPR, Williams-Hayward makes the following arguments: (1) the rebate agreement between Williams-Hayward and CPR disclaims all warranties; (2) CPR cannot assert claims for breach of implied warranty because it is not in contractual privity with Williams-Hayward; (3) CPR cannot assert its claim for breach of express warranty because it is not in contractual privity with Williams-Hayward; (4) CPR cannot establish a claim for unjust enrichment; (5) CPR cannot establish a claim for promissory estoppel; (6) the statute of frauds bars CPR's claims; and (7) CPR cannot establish that Williams-Hayward proximately caused its damages. The Court addresses each argument in turn.

17

## A.    Rebate Agreement

Central to Williams-Hayward's arguments on summary judgment is whether CPR and Williams-Hayward had a written "rebate agreement" containing disclaimers of warranties that would bar CPR's warranty claims and quasi-contract claims of unjust enrichment and promissory estoppel. Williams-Hayward contends that the "rebate agreement" is memorialized in Kurcz's August 30, 1999, letter and attached purchase agreement. Williams-Hayward asserts that this rebate agreement governs all of the parties' projects.

In Kurcz's August 1999 letter, he proposed an arrangement where CPR would agree to purchase large volumes of paint from Williams-Hayward in exchange for long-term fixed pricing. Kurcz suggested a fixed one-year pricing structure renewable at CPR's option with a rebate component. Kurcz attached a proposed purchase agreement to the letter that included a rebate agreement signed by Kurcz on behalf of Williams-Hayward. The proposed rebate agreement included language that the warranty described within was "in lieu of all warranties, or merchantability, fitness for purpose, or other warranties, express or implied."

The parties do not dispute that Quintal never signed the purchase agreement attached to the August 30, 1999 letter. CPR contends that Quintal rejected the offer and then made a counter-offer in his October 1, 1999, letter to Kurcz. The October 1, 1999, letter concerned 243 bi-level auto racks that Thrall Manufacturing would build and for which CPR would specify Williams-Hayward's Thermalbond paint. It further provided that CPR may award Williams-Hayward with additional projects if the initial project proved successful. The October 1, 1999, letter did not contain any disclaimers of warranties or limitations of remedies. Kurcz responded to Quintal in a letter dated October 4, 1999, stating that Quintal was correct as to the agreement.

18

Based on this correspondence, CPR argues that it did not agree to the disclaimers of warranty in the rebate agreements in the first instance. CPR also contends that the October 1, 1999, letter only pertains to the 243 bi-level racks to be built by Thrall Manufacturing, and not to any of the parties' subsequent projects.

In contrast, Kurcz testified that the 1999 purchase agreement covered all sales relative to CPR and applied to the paper boxcars at issue in this litigation. Williams-Hayward also contends that because CPR's filings in this matter are pleaded under Illinois law and the purchase agreement expressly provided that the contract was governed by Illinois law, CPR has adopted the purchase agreement, including the rebate agreement containing the disclaimers of warranties.

Viewing the evidence and reasonable inferences in a light most favorable to CPR, CPR has established that a genuine issue of material fact exists as to whether CPR and Williams-Hayward had a written agreement containing disclaimers of warranties that would bar CPR's warranty claims concerning the paper boxcars. In other words, CPR has presented evidence upon which a reasonable jury could find that the parties did not have a written agreement containing disclaimers of warranties. The parties' correspondence after Kurcz's August 1999 letter, plus Quintal's deposition testimony concerning future projects, calls into question whether Quintal accepted Kurcz's offer in the first instance and also whether the disclaimers of warranties applied to the parties' subsequent projects, including the paper boxcars at issue in this litigation. Under Illinois law, when there is a factual dispute, the question of whether a contract exists is one for the factfinder. *Reese v. Forsythe Mergers Group, Inc.*, 288 Ill.App.3d 972, 979, 224 Ill.Dec. 647, 682 N.E.2d 208 (Ill.App.Ct. 1997); *see also Glass v. Kemper Corp.*, 133 F.3d 999, 1001 (7th Cir. 1998) ("when the existence of a contract depends on inference from a series of documents, the

inference is to be drawn by the trier of fact"). Accordingly, whether the rebate agreement exists is a question for the jury.[1]

## B.     Implied Warranty Claims

In Counts II and III of its Second Amended Complaint, CPR alleges that Williams-Hayward breached the implied warranties of merchantability and fitness. Williams-Hayward contends that because CPR does not have contractual privity concerning the Thermalbond paint purchased by NSC, CPR cannot bring these claims. CPR, on the other hand, contends that it falls within the narrow class of plaintiffs that may assert implied warranty claims absent contractual privity.

## 1.     Privity Requirement & Exceptions

As opposed to an express warranty in which the warrantor has made the requisite affirmation as part of a contract, an "implied warranty is derived from the interplay of a transaction's factual circumstances with the foreseeable expectations of a buyer or other person who is protected by law in those expectations." *Collins Co. v. Carboline Co.*, 125 Ill.2d 498, 508-09, 127 Ill.Dec. 5, 532 N.E.2d 834 (Ill. 1988) (implied warranty arises despite seller's actual wishes). In general, Illinois law requires a plaintiff suing for breach of implied or express warranties to establish contractual privity. *See Reed v. City of Chicago*, 263 F.Supp.2d 1123, 1125 (N.D.Ill. 2003). Section 2-318 of the Illinois Uniform Commercial Code, however, contains exceptions to the general privity requirement. *Id.* Section 2-318 reads in pertinent part:

---

[1] For the first time in its Reply Brief, Williams-Hayward contends that CPR's claims are nothing more than "thinly-disguised tort claims" barred by *Moorman Mfg. Co v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 452 (Ill. 1982). Williams-Hayward waives this argument because it was brought for the first time in its Reply Brief. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004).

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Although this section lists mandatory exceptions to the privity requirement, this list is not exhaustive. *Reed,* 263 F.Supp.2d at 1125; *see also Whitaker v. Lian Feng Mach. Co.,* 156 Ill.App.3d 316, 321, 108 Ill.Dec. 895, 509 N.E.2d 591 (1987) (UCC warranty extends to buyer's employee). The Illinois Supreme Court, however, has not completely abolished the privity requirement in economic loss actions for breach of implied warranties. *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill. 1986); *see also Collins,* 125 Ill.2d at 516 (Section 2-318 and its comments leave "a door at least slightly ajar for future extension of some warranties in appropriate circumstances to nonprivity plaintiffs.").

CPR contends that because Williams-Hayward knew its identity, the purpose and requirements of the Thermalbond paint to be applied to the paper boxcars, and then delivered the paint to meet CPR's needs, CPR can bring its breach of implied warranty claims despite its lack of contractual privity. Indeed, Illinois courts recognize an exception to the privity requirement "when the remote manufacturer knows the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Crest Container Corp. v. R.H. Bishop Co.,* 111 Ill.App.3d 1068, 1076, 67 Ill. Dec. 727, 445 N.E.2d 19 (Ill.App.Ct. 1982) (quoting *Frank's Maint. & Eng'g v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 992-93, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct. 1980)).

Without a clear explanation or citations to legal authority, Williams-Hayward contends

that it is doubtful that this exception survived the Illinois Supreme Court's decision in *Szajna*. Courts in this district, however, have concluded that this exception did survive the *Szajna* decision and have applied this exception after the *Szajna* decision was entered. *See, e.g., Outboard Marine Corp. v. Babock Indus.,* Case No. 91 C 7247, 1995 WL 296963, at *5 (N.D. Ill. May 12, 1995); *Hirn v. Teledyne Cont'l Motors,* Case No. 93 C 7787, 1994 WL 685071, at *3 (N.D. Ill. Dec. 7, 1994); *Omni-Circuits, Inc. v. DRP, Inc.,* Case No. 85 C 9081, 1987 WL 7290, at * 2 (N.D.Ill. Feb. 23, 1987).

In *Omni-Circuits,* Judge Hart noted that the *Szajna* court did not address this exception and the Illinois court's reasoning behind requiring privity in economic loss cases allows for this exception to the privity requirement. *Id.* at *2-3. Also, as the Illinois Supreme Court recognized after its *Szajna* decision, Section 2-318 of the UCC may allow for future extensions of some warranties to nonprivity plaintiffs. *See Collins,* 125 Ill.2d at 516. Finally, after a thorough search of Illinois case law, the Court has not found any Illinois cases that abrogate the *Crest Container* exception subsequent to the *Szajna* holding. Accordingly, the Court concludes that the *Szajna* decision did not abolish the exception articulated in *Crest Container*. The Court thus turns to whether CPR has established a genuine issue of material fact relating to this exception.

Deposition testimony reveals that Quintal discussed the paper boxcar builds with Kurcz prior to CPR awarding the boxcar project to NSC. Further testimony indicates that Kurcz and Black were aware of CPR's specific paint needs because they told Cheun that other railways had used Williams-Hayward paint in boxcars and paper service. In addition, Cheun emailed Black asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our *new paper boxcars* or if there is a better coating that you would recommend?"

22

(emphasis added). Black responded by suggesting certain interior and exterior High-Rubber Thermalbond products. Black also testified that he knew of CPR's plans to build boxcars and that it would use some of the boxcars for paper services. Viewing the facts and inferences in a light most favorable to CPR, CPR has established that there are genuine issues of material fact whether Williams-Hayward (1) knew CPR was the ultimate consumer of the paint, (2) was aware of the paint's purpose, and (3) delivered the paint to meet CPR's needs.

## 2. CPR's Opportunity to Examine the Thermalbond Paint

Williams-Hayward contends that even if CPR and Williams-Hayward were in privity of contract, CPR would not have claims for breach of implied warranties because CPR had the opportunity to examine Williams-Hayward's paint. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co.,* 882 F.2d 1254, 1259 (7th Cir. 1989) (citing Section 2-316 of the Illinois Uniform Commercial Code). Section 2-316(3)(b) provides in pertinent part, "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Comment 8 of Section 2-316 explains: "'Examination' as used in this paragraph is not synonymous with inspection before acceptance or at any other time after the contract has been made. It goes rather to the nature of the responsibility assumed by the seller at the time of the making of the contract."

CPR admits that it examined the Williams-Hayward paint on various boxcars, but contends that it could not have discovered the latent defects of the paint by mere observation, but

instead needed chemical testing.[2] Comment 8 to 2-316 explains: "However, an examination under circumstances which does not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing." In other words, latent defects cannot be excluded from implied warranties by a parties' mere examination of the product. *Id.*; *Dacor Corp. v. Sierra Precision,* Case No. 93-2708, 1994 WL 83303, at *4 (7th Cir. Mar. 14, 1994).

CPR has raised a genuine issue of material fact that the paint's defects were not obvious upon mere examination. Whether CPR's examination precludes it from bringing the implied warranty claims is a question for the jury.

Williams-Hayward also argues that because CPR is a "professional buyer" that examined a product in their field, CPR "assumed the risk as to all defects which a professional in the field ought to observe." *See* UCC § 2-316, Comment 8. Williams-Hayward, however, does not fully explain how a corporation that operates a railroad is a professional buyer of paint. Instead, Williams-Hayward contends that CPR purchased "billions of dollars of goods and services each year" and that Cheun had experience selecting paint for boxcars. Without more, Williams-Hayward has not established that CPR is a professional buyer of paint. *See R & L Grain Co. v. Chicago Eastern Corp.*, 531 F.Supp. 201, 208 (N.D.Ill. 1981) (under Illinois law "it is the burden of the party seeking to invoke a warranty exclusion to plead and prove its effect").

Finally, the Court rejects Williams-Hayward's argument that CPR did not rely on Williams-Hayward's conduct and assertions in selecting a suitable paint for the paper boxcars.

---

[2] Any examinations made by CPR after the contract was formed do not affect the existence of the implied warranties. *See* White & Summers, Uniform Commercial Code § 12-6 (4th ed.)

As discussed throughout this opinion, CPR has established a genuine issue of material fact for trial concerning whether it relied on Williams-Hayward's assertions as to what was required for the coating in the paper boxcar service.

### 3.    Merchantability of Paint

Next, Williams-Hayward contends that CPR's paint requirements for the paper boxcars were not "ordinary," and thus CPR's claim does not fall within the warranty of merchantability. To establish a claim for breach of the implied warranty of merchantability, a plaintiff must show (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) the goods were not of merchantable quality, that is, the goods were unfit for the ordinary purposes for which they are used. *See Brandt v. Boston Scientific Corp.,* 204 Ill.2d 640, 645, 275 Ill.Dec. 65, 792 N.E.2d 296 (Ill. 2003); *Crest Container,* 111 Ill.App.3d at 107.

Williams-Hayward has provided evidence that CPR's paper boxcars were intended to be state-of-the-art boxcars that would ensure damage free transportation. Based on this evidence, Williams-Hayward contends that use of its paint was not for the ordinary purposes for which they are used. *See Brandt,* 204 Ill.2d at 645. This evidence alone, however, does not unequivocally establish that Williams-Hayward's paint was merchantable. Instead, the question of whether the paint's use in the paper boxcars was "ordinary," is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct. 2003). The Court, therefore, denies Williams-Hayward's motion for summary judgment as to Count II of CPR's Second Amended Complaint.

### C.    Express Warranty Claim

CPR also alleges a claim for breach of express warranties under Section 2-313 of the

Illinois Uniform Commercial Code. Section 2-313(1)(a) states: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." The Illinois Supreme Court has explained that an express "warranty arises only because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct." *Collins,* 125 Ill.2d at 509. In general, because an express warranty is a "creature of contract," a party must have privity to the contract before bringing a breach of express warranty claim. *See id.* at 510-11; *see also Collins Co., Ltd. v. Carboline Co.,* 837 F.2d 299, 301 (7th Cir. 1988) (applying Illinois law).

Williams-Hayward contends that because CPR has no privity of contract to the sales contract between Williams-Hayward and NSC, CPR cannot bring any express warranty claims. CPR argues that despite its lack of privity to the paint contract, express warranties are enforceable by those to whom the warranties are made. In support of this argument, CPR relies on case law involving the purchase of automobiles with express written manufacturer warranties or implied warranties under the federal Magnuson-Moss Act. These cases are both factually and legally distinguishable from this matter. *See Rothe v. Maloney Cadillac,* 119 Ill.2d 288, 116 Ill.Dec. 207, 518 N.E.2d 1028 (Ill. 1988); *Connick v. Suzuki Motor Co., Ltd.,* 275 Ill.App.3d 705, 212 Ill.Dec.17, 656 N.E.2d 170 (Ill.App.Ct. 1995), *rev'd on other grounds,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill. 1996); *see also Ampat/Midwest, Inc. v. Illinois Tool Works, Inc.,* No. 85 C 100029, 1988 WL 53222 (N.D. Ill. May 12, 1988).

In the context of a buyer purchasing a product from a dealer and not the manufacturer, Illinois courts have concluded that brochures, documents, and advertisements may be the basis of

26

express warranty. *See Connick,* 275 Ill.App.3d at 713. In other words, manufacturer documents given directly to the buyer prior to a purchase may give rise to an express warranty because the assertions become part of the basis of the bargain unless clear affirmative proof shows otherwise. *See Ampat/Midwest, Inc.,* 1988 WL 53222, at *4; *Crest Container,* 111 Ill.App.3d at 1074 (coil manufacturer's catalog created express warranty).

Here, CPR does not explain how this exception to the privity requirement applies to the circumstances at hand. For instance, CPR does not come forward with evidence of manufacturer brochures, catalogs, or advertisements that were part of the basis of the bargain supporting their claim for express warranties. Specifically, CPR has not established that Williams-Hayward made specific, written promises or warranties via manufacturer's catalogs or other marketing materials. Without more, the Court would be hard-pressed to extend this exception to CPR's claims that Black and Kurcz made statements that constitute express warranties.

As discussed, there are very few exceptions to the privity requirement for a plaintiff suing for breach of express or implied warranty, *see Reed,* 263 F.Supp.2d at 1125, and CPR has failed to establish that it fits within any exception to this requirement regarding express warranties. Accordingly, the Court grants Williams-Hayward's summary judgment motion as to Count I of CPR's Second Amended Complaint.

### D.     Unjust Enrichment and Promissory Estoppel

Williams-Hayward contends that because it has established that the rebate agreement governs the parties' disputes, CPR cannot bring its claims of promissory estoppel and unjust enrichment. Indeed, when a specific contract governs the parties' relationship, quasi-contractual theories, such as unjust enrichment or promissory estoppel, cannot form a basis for damages. *See*

27

*Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (Ill. 1992); *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956, 964 (Ill.App.Ct. 1992) (plaintiff cannot bring promissory estoppel claim when parties have entered a binding contract on same subject matter).

### 1.    Alternative Claims

CPR, however, has brought these quasi-contractual claims in the alternative to its breach of warranty claims, a practice not only allowed under Federal Rule of Civil Procedure 8(e)(2), but one that is common. *See, e.g., Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003); *see also Prentice v. UDC Advisory Servs., Inc.*, 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 695, 648 N.E.2d 146, 151 (Ill.App.Ct. 1995) (alternative claims for breach of contract and promissory estoppel permissible). In *Cromeens*, the Seventh Circuit explained that under the doctrine of pleading in the alternative, "a party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available." *Id.*; *see also Prentice*, 271 Ill.App.3d at 512 (once enforceable contract exists, party may no longer recover under theory of promissory estoppel).

CPR has established that a genuine issue of material fact exists as to whether there is a contract between the parties, as discussed above. Because there is a factual dispute, the question of whether a contract exists is for the jury to decide. *See Reese*, 288 Ill.App.3d at 979. As such, CPR may maintain its alternative quasi-contractual theories at this procedural juncture.

### 2.    Unjust Enrichment

Without a fully-developed explanation, Williams-Hayward contends that CPR cannot

28

establish that it was unjustly enriched because NSC still owes it money for the paint. Williams-Hayward does not provide the Court with any legal authority supporting its argument that because it has not been paid the full amount for NSC's purchase, it has not unjustly retained any benefits to CPR's detriment.

To establish unjust enrichment, CPR must show that Williams-Hayward has unjustly retained a benefit to CPR's detriment and that Williams-Hayward's retention of that benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mount Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill. 1989).

Here, CPR sets forth evidence that Williams-Hayward allegedly recommended paint for the paper cars that was more expensive than Williams-Hayward's general service paint. (Pls' Stmt. ¶ 119.) Further, CPR has provided evidence that NSC paid Williams-Hayward a "significant sum" for the paint. (*Id.* ¶ 185.) Thus, CPR contends that it would be fundamentally unjust for Williams-Hayward to retain the benefit of selling a more expensive product when CPR did not receive the benefit of a superior coating for the paper boxcars.

Viewing the facts and inferences in a light most favorable to CPR, the Court concludes that CPR has established a genuine issue of material fact as to whether Williams-Hayward was unjustly enriched. Accordingly, the Court denies Williams-Hayward's motion for summary judgment as to Count IV.

### E. Statute of Frauds

Williams-Hayward argues that because the sale of paint was in excess of $500, any alleged contract must be in writing to satisfy the statute of frauds, and thus CPR cannot succeed

on any of its claims. CPR contends that Williams-Hayward has waived this affirmative defense because Williams-Hayward makes this argument for the first time in its motion for summary judgment.

"Federal Rule of Civil Procedure 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading. We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chicago Hous. Auth.,* 360 F.3d 721, 735 (7th Cir. 2004); *see also Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000) (collecting cases). The Seventh Circuit has further articulated that if "Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the *eleventh hour*, without excuse and without adequate notice to the plaintiff." *Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997) (emphasis added).

Williams-Hayward brings its statute of frauds defense for the first time in its motion for summary judgment – approximately two months before trial is set to commence and well over two years after CPR filed its original complaint. Williams-Hayward does not explain why it brought this affirmative defense so late in the proceedings. Although Williams-Hayward contends that it has given CPR adequate notice concerning its statute of frauds defense, Williams-Hayward fails to take into account that the trial is scheduled to begin on May 2, 2005. In other words, it is the eleventh hour. Under these circumstances, there is no excuse for Williams-Hayward's failure to raise its affirmative defense earlier in the proceedings. *See Castro* 360 F.3d at 735.

**F.     Damages**

Last, Williams-Hayward argues that CPR cannot establish that its damages were proximately caused by Williams-Hayward.  First, Williams-Hayward argues that because CPR failed to make a claim for the difference between the value of the goods accepted and the value they would have if Williams-Hayward had warranted them, CPR cannot recover any damages in this matter.

Under the Illinois Uniform Commercial Code, Section 2-714(2):  "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.*  Courts read the "special circumstances" exception in conjunction with Section 1-106 of the UCC, which provides that UCC remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." *Razor v. Hyundai Motor Am.,* 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct. 2004).  Also, an aggrieved party may recover incidental and consequential damages under Section 2-714(3). *Id.*

Based on these standards, "the difference between the value of the goods accepted and the value they would have had they been warranted" is not the sole measure of damages as Williams-Hayward asserts.  Therefore, CPR's claims of incidental and consequential damages flowing from the breach are appropriate under the circumstances.

Second, Williams-Hayward contends that CPR cannot establish that its incidental and consequential damages are reasonable or were foreseeable by Williams-Hayward at the time of

31

contracting.[3] Williams-Hayward specifically argues that because it had no reason to know CPR's particular requirements for the paper boxcars, it cannot be liable for any losses resulting from them. This argument is based on a fact in dispute, namely, whether Williams-Hayward knew of CPR's requirements for the paper boxcars. Because damages are determined by the factfinder "in the exercise of sound discretion and in any manner reasonable under the circumstances," *see id.* at 660, Williams-Hayward's argument fails.

## II. Summary Judgment Motion Against NSC

In support of its motion for summary judgment against NSC, Williams-Hayward contends that NSC cannot establish: (1) that Williams-Hayward made any express warranties; (2) its claims for breach of implied warranties; (3) its promissory estoppel claims; (4) its tortious interference with contract claim; (5) its fraud and fraudulent concealment claim; and (6) that Williams-Hayward proximately caused its alleged damages. The Court discusses each argument below.

### A. Breach of Express Warranties

Count I of NSC's Second Amended Counterclaim alleges a claim for breach of express warranties under Section 2-313 of the Illinois Uniform Commercial Code. Under Section 2-313(1)(a): "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." In other words, "in a breach of express warranty

---

[3] For the first time in its Reply Brief, Williams-Hayward contends that CPR cannot recover consequential damages. *See Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill.1986). Williams-Hayward waives this argument because it was made for the first time in the Reply Brief. *See Carter v. Tennant Co.,* 383 F.3d 673, 679 (7th Cir. 2004). Also, Williams-Hayward's reliance on the dicta in *Szajna* is misplaced.

action under the UCC, plaintiff must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain." *Hasek v. DaimlerChrysler Corp.,* 319 Ill.App.3d 780, 788, 253 Ill.Dec. 504, 745 N.E.2d 627 (Ill.App.Ct. 2001).

### 1. Verbal Assurances

Williams-Hayward contends that it made no verbal warranties to NSC that its High-Rubber Thermalbond paint would be an acceptable treatment for the paper boxcars. Specifically, Williams-Hayward argues that the information Norman Black, Williams-Hayward's Director of Canadian Operations, gave Dennis Ryan, NSC's Managing Director, when NSC was preparing its bid for CPR does not amount to "affirmations of fact or promises." Williams-Hayward relies on Black and Ryan's first meeting when Black provided Ryan with information concerning Williams-Hayward's alleged recommendations for the exterior and interior paint for the boxcars. (*See* Pls' Stmt ¶ 58; Pls' Ex.10, Ryan Dep. at 63-64.)

NSC, however, contends that Williams-Hayward ignores other testimony in the record that Ryan informed Black that some of the boxcars would be used in paper service and that the elimination of damage to the paper rolls was a critical feature of the paper boxcars. For example, Ryan testified that in his later meetings with Black, they discussed the specifics of the paper boxcar projects, such as the type of loading, the importance of the interior lining, and that the boxcars would be hauling newspaper service.

Nevertheless, Williams-Hayward contends that the parole evidence rule bars any evidence of its alleged verbal recommendations made to NSC. Under Illinois common law, parol or extrinsic evidence regarding a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated contract. *Eichengreen v. Rollins, Inc.,* 325 Ill.App.3d 517, 521, 259

33

Ill.Dec. 89, 757 N.E.2d 952 (Ill.App.Ct. 2001).

NSC, however, brings its express warranty claim under the Illinois Uniform Commercial Code. Relying on the Restatement (Second) of Contracts, Section 214, the Illinois Supreme Court expressly stated that in UCC cases, as opposed to claims based on Illinois common law, parol evidence is admissible to determine whether an agreement is completely or partially integrated and also to explain the meaning of a fully integrated contract. *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1314 (7th Cir. 1996) (citing *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill.2d 265, 271-72, 205 Ill.Dec. 98, 642 N.E.2d 1215 (Ill. 1994)). In addition, courts need not decide that the a contract is ambiguous as a condition for the admission of parol evidence in UCC cases. *See Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill.App.3d 1010, 1020-21, 273 Ill.Dec. 96, 788 N.E.2d 405 (Ill.App.Ct. 2003). As such, the parol evidence rule does not bar evidence of Williams-Hayward's alleged verbal assurances or recommendations.

## 2.    Written Warranties

NSC has also establish that the purchase order contains express written warranties.[4] For instance, conditions to the purchase order include that "the Seller expressly warrants that all the

---

[4] Williams-Hayward argues that its invoices following the shipments of paint, and not the purchase order, are the controlling contractual documents. Williams-Hayward, however, signed the acknowledgment copy of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT TO ALL TERMS AND CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF. By signing this acknowledgment, Williams-Hayward accepted NSC's offer set forth in the purchase order. *See Outboard Marine Corp. v. Babock Indus.*, Case No. 91 C 7247, 1995 WL 296963, at *5 (N.D. Ill. May 12, 1995) (citing UCC Section 2-207.) Furthermore, because the purchase order prohibits any attempts to impose additional terms to the contract through invoices, Williams-Hayward's subsequent invoices are not part of the contract for the purchase of the paint. *See id.*

material and work covered by this order will conform to the specifications, drawings, samples or other description, if any, furnished or specified by Buyer." Further, NSC points to language in the purchase order stating: "Suppliers are responsible for understanding the nature of the work and the tolerances the parts must meet."

Williams-Hayward's argument that NSC waived any express warranty claims because Williams-Hayward informed NSC that it would supply free epoxy paint to replace the High-Rubber Thermalbond on the paper boxcars is a disputed fact. Accordingly, it cannot be the basis for a finding of waiver. NSC has established a genuine issue of material fact as to whether Williams-Hayward made express warranties to NSC and whether Williams-Hayward breached those express warranties.[5]

## B.  Breach of Implied Warranties

In Counts II and III of its Second Amended Counterclaim, NSC alleges that Williams-Hayward breached the implied warranties of fitness and merchantability. Williams-Hayward contends that NSC's experience with Williams-Hayward's paint and its opportunities to test the paint preclude its claims for breach of implied warranties. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co.,* 882 F.2d 1254, 1259 (7th Cir. 1989).

First, Williams-Hayward argues that NSC is a professional buyer that examined a product in its field, and thus NSC "assumed the risk as to all defects which a professional in the field

---

[5] Based on facts in dispute, Williams-Hayward makes the cursory argument that NSC did not rely on the alleged verbal representations, and thus they were not the "basis of the bargain" as required for a breach of express warranty claim. Because Williams-Hayward's argument is undeveloped, the Court considers it waived. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *see also Weng v. Allison,* 287 Ill.App.3d 535, 538, 223 Ill.Dec.123, 678 N.E.2d 1254 (Ill.App.Ct. 1997) (burden on seller to establish by affirmative proof that affirmations did not become part of basis of bargain).

ought to observe." *See* Illinois UCC Section 2-316, Comment 8. Williams-Hayward does not completely explain how a rail car manufacturer is a professional buyer of paint. Indeed, in his email of December 18, 2001, Kurcz admits that NSC did not have experience with Williams-Hayward's High-Rubber Thermalbond paint. Nevertheless, Williams-Hayward argues that because NSC maintained a department devoted to the purchase of speciality items, including paint, for the rail cars it manufactured, it is a "professional in the field." This limited argument simply does not satisfy Williams-Hayward's burden of establishing the exclusion of claims based on the implied warranty of fitness or merchantability. *See R & L Grain Co. v. Chicago Eastern Corp.*, 531 F.Supp. 201, 208 (N.D.Ill. 1981).

Second, Williams-Hayward contends that because NSC had the opportunity to examine the High-Rubber Thermalbond paint in trial applications, it cannot bring its claims for breach of implied warranties. *See* Illinois UCC Section 2-316, Comment 8. NSC, however, correctly notes that the purpose behind the trial applications was for Williams-Hayward's Black to explain how to apply the paint safely and properly. In addition, there is no evidence in the record that NSC examined the High-Rubber Thermalbond's propensity to fuse with paper or its ability to perform in paper service, because NSC contends that the paint's propensity to stick was a latent defect. Also, NSC asserts that it did not have the ability to load paper rolls into the paper boxcars after they were painted. (*See* Pls' Stmt. ¶ 82.) Finally, after the pull-ahead car exhibited sticking problems and NSC's own "jack test" failed, Kurcz of Williams-Hayward emailed NSC's Wilson explaining that he did not see a need for any paint testing if NSC proceeded with its process and used the recommended cure parameters.

Based on this evidence, NSC has created a genuine issue of material fact of whether it is

36

barred from bringing its implied warranty claims based on the "examination" exception under Comment 8 of Section 2-316 if the Illinois Uniform Commercial Code.[6]

## C. Promissory Estoppel Claims

NSC brings two counts based on promissory estoppel – promissory estoppel related to the suitability of the paint and promissory estoppel related to the application of the paint. Williams-Hayward contends that because there is a binding sales contract between the parties, NSC cannot bring any claims of promissory estoppel. *See Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.,* 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956 (Ill.App.Ct. 1992) (plaintiff cannot bring promissory estoppel claim when parties have entered into binding contract on same subject matter). NSC, on the other hand, contends that the promises underlying its promissory estoppel claims concern different subject matter than the sales contract. *See Prentice v. UDC Advisory Servs., Inc.,* 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 648 N.E.2d 146 (Ill.App.Ct. 1995); *see also Industrial Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.,* 104 Ill.App.3d 357, 361-61, 60 Ill.Dec. 100, 432 N.E.2d 999 (Ill.App.Ct. 1982)("general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests").

Here, NSC has presented statements and recommendations made by Kurcz that pertain to the circumstances after the pull-ahead car and paper car 220164 experienced paint sticking problems. These allegations are different in subject matter than the sales contract. Williams-

---

[6] Again, Williams-Hayward makes the argument that the paint was merchantable because it was not used for an "ordinary purpose." As discussed in detail above, whether the use of High-Rubber Thermalbond in the paper boxcars was "ordinary" is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct. 2003).

Hayward's "promises" include Kurcz's assurances made to Pafford and Wilson in the fall of 2001 and Williams-Hayward's recommended changes to the process in which NSC would coat and cure the paint. Based on this evidence, NSC has established a genuine issue of material fact that its promissory estoppel claims concern a different subject matter than the sales contract.

Finally, Williams-Hayward contends that the statute of frauds prohibits NSC from bringing its promissory estoppel claims. The Court notes that Williams-Hayward's alleged promises to NSC that form the basis of its promissory estoppel claims are in writing. The Court rejects Williams-Hayward's statute of frauds defense for the reasons stated in detail above.

### D. Tortious Interference with Contract

NSC brings a claim of tortious interference with contract, which requires a plaintiff to show (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) defendant's awareness of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party, and (5) damages resulting from the breach. *Purmal v. Robert N. Wadington & Assocs.,* 354 Ill.App.3d 715, 289 Ill.Dec. 578, 820 N.E.2d 86 (Ill.App.Ct. 2004).

Williams-Hayward contends that NSC cannot establish that it intentionally and unjustifiably induced CPR to breach its contract with NSC. NSC does not address Williams-Hayward's argument, instead, NSC argues that sufficient evidence exists to establish fraudulent intent. A claim of tortious interference with contract, however, does not require that the actor have "fraudulent intent."

"The tort of interference with existing or prospective contractual relations requires that the interference be both intentional and improper." *LaRocco v. Bakwin,* 108 Ill.App.3d 723, 730,

64 Ill.Dec. 286, 291-92, 439 N.E.2d 537 (Ill.App.Ct. 1982) (citing Section 767 of the Restatement (Second) of Torts)). Comment d. to Section 767 of the Restatement (Second) of Torts explains that because interference with contractual relations is an intentional tort, "the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct."

NSC does not argue either how Williams-Hayward desired to interfere with NSC and CPR's contract or how Williams-Hayward knew that CPR's alleged breach would be a "substantially certain result" of its conduct. In addition, NSC presents no arguments with supporting evidence that CPR actually breached their contract. Without more, NSC's tortious interference with contract must fail.[7] Therefore, the Court grants Williams-Hayward's motion for summary judgment as to Count VI of NSC's Second Amended Counterclaim.

## E. Fraudulent Misrepresentation and Concealment

In Count VII of its Second Amended Counterclaim, NSC alleges fraudulent misrepresentation and concealment against Williams-Hayward. Under Illinois law, a party must prove the elements of fraud by clear and convincing evidence. *In re Application of Rosewell*, 106 Ill.2d 311, 318-19, 88 Ill.Dec. 28, 478 N.E.2d 343 (Ill. 1985); *see also Bixby's Food Sys., Inc. v. McKay*, 193 F.Supp.2d 1053 (N.D.Ill. 2002). At summary judgment NSC must establish the elements of fraudulent misrepresentation and concealment by clear and convincing evidence because it must carry this burden of proof at trial. *See Celotex Corp*, 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252-53.

---

[7] It is not the Court's role to construct the litigants' legal arguments, especially when the parties are represented by counsel. *See Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996).

39

The elements of a claim for fraudulent misrepresentation are: (1) defendant made a false statement of material fact; (2) defendant knew that the statement was false; (3) defendant intended that the statement would induce the plaintiff to act; (4) plaintiff relied on the truth of the statement; and (5) plaintiff's damages resulted from reliance on the statement. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 882 (7th Cir. 2005); *Board of Educ. of City of Chicago v. A, C, and S, Inc.*, 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 546 N.E.2d 580 (Ill. 1989). "In its general sense, 'fraud' means anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Tri-G Inc. v. Burke, Bosselman & Weaver*, 353 Ill.App.3d 197, 216, 288 Ill.Dec. 580, 817 N.E.2d 1230 (Ill.App.Ct. 2004).

### 1. False Statements of Fact

Williams-Hayward contends that NSC cannot establish that it made false statements of fact because the asserted facts amount to nothing more than Williams-Hayward's opinions. In general, an expression of opinion will not support an action for fraud. *See Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 489, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1272 (Ill.App.Ct. 1981); *see also West v. Western Cas. & Surety Co.*, 846 F.2d 387, 393 (7th Cir. 1988) ("statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation"). Whether a statement is one of fact or opinion depends on the circumstances of a case. *Prime Leasing, Inc. v. Kendig*, 332 Ill.App.3d 300, 309, 265 Ill.Dec. 722, 773 N.E.2d 84 (Ill.App.Ct. 2002). "A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to

40

determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact." *West,* 846 F.2d at 393. When a speaker "holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff," the speaker's "opinion becomes in effect an assertion summarizing his knowledge." *Id.* (citing *Duhl,* 102 Ill.App.3d at 489). "Thus, the general rule is that it is not 'the form of the statement which is important and controlling, but the sense in which it is reasonably understood.'" *West,* 846 F.2d at 394 (quoting Prosser & Keeton on Torts § 109, at 755 (W. Keeton 5th ed. 1984)).

NSC, however, has presented sufficient evidence, under the clear and convincing standard of proof, to establish that a genuine issue of material fact exists to whether Kurcz's statements in his email of September 5, 2001, Kurcz's subsequent assurances made in September 2001, and Kurcz's email of December 18, 2001, contained false statements of material facts. For instance, NSC has set forth evidence that Kurcz held himself out as experienced in developing water based products for the rail and chemical industry for over 30 years and that Williams–Hayward "know[s] of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate." (*See* Def.'s Stmt. ¶ 178.) Kurcz also stated that Williams–Hayward was the "oldest supplier of water based products in the rail industry and we are confident we are also the best." (*See* Def.'s Stmt. ¶ 200.)

Furthermore, NSC has come forward with evidence of Kurcz's assertion that Williams–Hayward's High-Rubber Thermalbond paint, if properly applied, would pose no problems for the transport of the paper rolls. Kurcz also explained to NSC's Todd Pafford that the High-Rubber Thermalbond paint would do the job it was intended to do. Also, there is sufficient evidence in

the record that Kurcz knew the problem of the paint sticking in the paper cars when he made these statements.

Based on this evidence, a reasonable jury could find that Kurcz made false statements of fact. Specifically, examining the emails in the context of the paper boxcar sticking problems that occurred during the fall of 2001, a reasonable jury could find that Kurcz had summarized his knowledge of the paint systems based on his background and expertise, and that Kurcz's emails contained false statements of material facts.

### 2. Scienter

Williams-Hayward also contends that NSC cannot prove that it intentionally made a false statement of material fact. The Court notes that "evaluations of motive and intent are generally inappropriate on a motion for summary judgment," *see Kyle v. Patterson,* 196 F.3d 695, 698 (7th Cir. 1999), and that "resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible." *FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir. 1980) (summary judgment often inappropriate in fraud claims because district court would be required to resolve subjective issue of fraudulent intent). There is no absolute rule, however, that precludes summary judgment concerning fraud claims. *Id.; see also Munson v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985) ("although summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position").

NSC has presented evidence upon which a reasonable jury could find by clear and convincing evidence that Williams-Hayward made representations in reckless disregard or culpable ignorance of their truth or falsity. *See Hartmann Co. v. Capital Bank & Trust Co.,* 296

42

Ill.App.3d 593, 602, 230 Ill.Dec. 830, 694 N.E.2d 1108 (Ill.App.Ct. 1998). Specifically, NSC

has set forth evidence that while Williams-Hayward was making assurances that the High Rubber

Thermalbond paint, if applied properly, would pose no problems for the transport of the paper

rolls, Kurcz admitted to Black and Ed Kurcz that the paint sticking problem "could be big trouble

if it is not a mill thickness issue." (Pls' Stmt. ¶ 148.) Despite Kurcz's assurance to NSC's

Pafford that they never had one paper sticking complaint in all Williams-Hayward's years of

service, there is evidence in the record that during the December 21, 2001, telephone conference,

Kurcz stated that some of the boxcars from the other railroad companies that had used High-

Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that

this was an accepted industry problem.

### 3.  Reliance

Next, Williams-Hayward contends that NSC cannot establish that it relied on Kurcz's

statements made in his fall of 2001 emails. To establish justifiable reliance, NSC must show that

it reasonably relied on Williams-Hayward's representations in light of the facts within NSC's

actual knowledge and any facts NSC might have discovered by the exercise of ordinary prudence.

*See D.S.A. Fin. Corp. v. County of Cook,* 345 Ill.App.3d 554, 559, 280 Ill.Dec.130, 801 N.E.2d

1075 (Ill.App.Ct. 2003). Justifiable reliance is typically a question of fact for the jury. *Id.*

Here, NSC has established that there is a genuine issue of material fact as to its reliance

on Kurcz's assurances and statements. There is evidence in the record that because of NSC's

limited experience with High-Rubber Thermalbond paint, NSC needed full "buy-off" from

Williams-Hayward that NSC's application was in accordance with Williams-Hayward's

technical requirements and was fit for the service intended. NSC also presents evidence that it

43

relied on Williams-Hayward's assurances and followed Black's and Williams-Hayward's revised paint application process.

### 4. Fraudulent Concealment – Duty to Disclose

To establish a claim for fraudulent concealment, a plaintiff must show, in addition to the elements of fraudulent misrepresentation, that the defendant concealed a material fact when it was under the duty to disclose that fact to the plaintiff. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 762, 286 Ill.Dec. 734, 814 N.E.2d 960 (Ill.App.Ct. 2004). The duty to disclose certain material facts may arise out of several situations, including if (1) plaintiff and defendant are in a fiduciary or confidential relationship, or (2) plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority. *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 250, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill. 1996) (citations omitted).

A genuine issue of material fact exists as to whether NSC placed trust and confidence in Williams-Hayward. The record reveals that Williams-Hayward knew that NSC had no experience with High Rubber Thermalbond prior to its contract with CPR to manufacture the paper boxcars. Not only did Williams-Hayward develop the High-Rubber Thermalbond in the first instance, but Kurcz expressly stated that Williams-Hayward had extensive experience in the industry. Specifically, Kurcz emailed Pafford: "We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC and to our mutual customer Canadian Pacific Railroad." (Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

Because NSC has established that a genuine issue of material fact exists as to whether it placed trust and confidence in Williams-Hayward, the question of whether Williams-Hayward had a duty to disclose material facts is a question for the jury.

## F.   Damages

Last, Williams-Hayward contends that NSC cannot establish that Williams-Hayward caused its alleged damages.

### 1.   Breach of Warranty Claims

Williams-Hayward argues that because NSC failed to make a claim for the difference between the value of the goods accepted and the value they would have had they been warranted, NSC cannot recover any damages in this matter. As discussed above, under the Illinois Uniform Commercial Code, Section 2-714(2), "the difference between the value of the goods accepted and the value they would have had they been warranted" is not the sole measure of damages as Williams-Hayward asserts. Instead, an aggrieved party may recover incidental and consequential damages under Section 2-714(3) and also damages if "special circumstances show proximate damages of a different amount." *See Razor v. Hyundai Motor America*, 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct. 2004).

Nonetheless, Williams-Hayward contends that it had no reason to know of NSC's particular requirements for the paper cars at the time of contracting, and thus it cannot be held liable for any losses resulting from them. The Court, however, has already concluded that there is a genuine issue of material fact concerning Williams-Hayward's knowledge of the paint's requirements for the paper boxcars. Accordingly, Williams-Hayward's argument fails.

### 2. Promissory Estoppel Claims

Next, Williams-Hayward contends that the promissory estoppel claims are merely a reiteration of the warranty claims; therefore, the proper damages are the "difference between the value of the goods accepted and the value they would have had they been warranted." *See* Illinois Uniform Commercial Code, Section 2-714(2). The Court, however, has rejected Williams-Hayward's argument that the promissory estoppel claims are based on the same subject matter as the sales contract. Williams-Hayward's argument concerning promissory estoppel damages also fails.

### 3. Fraud Claim

Williams-Hayward asserts that NSC cannot recover damages for loss of reputation, interest charges, and cost overruns from the repainting of the paper boxcars because these damages were not a foreseeable result of Williams-Hayward's alleged fraud. Williams-Hayward discusses the law of proximate cause, but does not support its argument with facts in the record. Without a more developed argument, Williams-Hayward has failed to establish that, as a matter of law, NSC cannot establish damages based on its fraudulent misrepresentation and concealment claim. Because proximate cause for tort damages is generally a question of fact, this issue is for the jury to decide. *Kavales v. City of Berwyn*, 305 Ill.App.3d 536, 547, 238 Ill.Dec. 738, 712 N.E.2d 842 (Ill.App.Ct. 1999).

Finally, Williams-Hayward contends that NSC cannot establish any entitlement to exemplary damages because there is no evidence of Williams-Hayward's fraudulent conduct. As discussed, NSC has established a genuine issue of material fact as to its fraud claim against Williams-Hayward, and thus Williams-Hayward's argument regarding exemplary damages fails.

## III. Summary Judgment Motion on Williams-Hayward's Count I of Counterclaim

In Count I of its Counterclaims, Williams-Hayward, relying on Illinois Uniform Commercial Code Section 2-709, contends that, as a matter of law, it is entitled to the payment of the purchase price and additional accrued charges for the paint accepted by NSC. For the following reasons, Williams-Hayward's argument fails.

NSC asserts that it properly revoked acceptance of the "non-conforming goods" under Section 2-608 of the Illinois Uniform Commercial Code, and thus is not required to pay the remainder of the purchase price as Williams-Hayward contends. Section 2-608 reads:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> > (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
> >
> > (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

In essence, when a buyer has already accepted goods, he may revoke acceptance when a nonconformity substantially impairs the value of the goods. *See Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill.App.3d 313, 320-21, 242 Ill.Dec. 738, 722 N.E.2d 227 (Ill.App.Ct. 1999). Whether an attempted revocation of acceptance is valid hinges on material questions of fact. *Id.* at 321 ("trier of fact must determine whether the alleged nonconformities in the goods caused substantial impairment to the buyer")

Based on Williams-Hayward's assurances that the paint's stickiness problems would be cured, NSC contends that it may revoke its acceptance under Section 2-608. Williams-Hayward, however, contends that despite the alleged assurances made in the fall of 2001, NSC's continued

47

use of the High-Rubber Thermalbond demonstrates that NSC never revoked its acceptance of the paint. Illinois courts, however, reject the notion that use by the buyer constitutes irrevocable acceptance. *See North Am. Lighting, Inc. v. Hopkins Mfg. Corp.,* 37 F.3d 1253, 1259 (7th Cir. 1994); *Frank's Maint. & Eng'g v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 986, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct. 1980).

Nonetheless, Williams-Hayward argues that NSC has failed to demonstrate that it "experienced a substantial impairment of value after it accepted and consumed Williams-Hayward's paint." To establish the substantial impairment of the value of goods, a buyer must bring forward objective evidence that, with respect to his needs, the value of the goods was substantially impaired. *GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 978, 51 Ill.Dec. 245, 420 N.E.2d 659 (Ill.App.Ct. 1981); *see also North Am. Lighting, Inc.,* 37 F.3d at 1259.

NSC has provided ample evidence that due to the propensity of the High-Rubber Thermalbond to fuse with the paper rolls, the paint had no value to NSC. For example, after hauling newsprint paper rolls, the pull-ahead car and subsequent trial cars all exhibited sticking problems, namely, the paint stuck to the paper rolls' wrappings and exposed the paper rolls to damage. Because of this damage, the newsprint paper supplier refused to accept the paper boxcars for its service. A reasonable jury could find that the paint's stickiness problems rendered the boxcars unsuitable for paper service.

Next, Williams-Hayward contends that NSC exercised improper ownership over the paint remaining on NSC's premises after NSC determined that the paint was non-conforming. Section 2-603(1) of the Illinois Uniform Commercial Code explains that absent instructions from the

48

seller with respect to the goods, a "buyer does not have a duty to return goods; rather the burden is on the seller to repossess them if he wants them." *See Frank's Maint.*, 86 Ill.App.3d at 986. NSC has set forth evidence that Williams-Hayward never provided instructions regarding the disposition of the paint, nor did Williams-Hayward attempt to retrieve the paint. (Pls' Stmt. ¶¶ 180-82.) Because NSC has raised a genuine issue of material fact concerning the disposition of the paint, Williams-Hayward's argument fails.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant's Motions for Summary Judgment.

Dated: April 6, 2005

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge